### BILL STANFORD v. THE STATE.

No. 20349. Delivered May 3, 1939.

The opinion states the case.

*Mahan & Broughton,* of Childress, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, Judge.

The offense is receiving and concealing stolen edible meat; the punishment a fine of $50.

On the 27th of February, 1938, James Carothers and Jack Land went to the home of T. F. Heath, broke into his smokehouse and stole a ham and some other meat. After they had committed the theft Carothers went to the home of appellant about 10 o'clock at night and sold him a middling of meat he had taken from the smokehouse. Joe Blanks drove him to appellant's home in his (Blanks') car. Appellant paid Carothers two dollars for the meat. Appellant did not ask him where he had gotten the meat. Prior to receiving the meat, appellant had a conversation with Land. The foregoing is in substance the testimony of Carothers.

Joe Blanks testified to the effect that he carried Carothers to the home of the appellant in his car on the occasion of the delivery of the meat. He said appellant and Carothers carried the meat into the house and later Carothers returned to

the car and they drove away. The witness declared that he did not know the meat had been stolen.

The sheriff testified that he went to appellant's home and made a search for stolen meat, which he discovered in appellant's smokehouse. When the sheriff found the meat appellant said that it was meat "he had raised and killed and cured." Appellant told the sheriff that he had not bought the meat from Carothers.

T. F. Heath testified that he was not at home at the time his smokehouse was burglarized. He said: "Yes, sir, I was down to Fort Worth when this meat was first missing. I stayed down there four weeks to a day. My son-in-law, Stanley Conner, had charge of the place, Stanley Conner and his wife, while I was gone. They had charge of the meat just like it was theirs', while we were gone. They used some of it, just like it was theirs'." Further, he testified: "I can't say whether I had any meat in that smokehouse in the month of February and along about the 27th, because I wasn't at home at that time."

Stanley Conner testified that at the time the theft was commited he was living at Mr. Heath's house. He said: "I married Mr. Heath's daughter. At the time Mrs. Conner and I were there, we were taking care of the place and things while they were gone." Further, he testified: "Yes, sir, we had charge of the place at that time. We had access to the meat and used it and controlled it as though it was our own. We had that at the time it was missing."

Testifying in his own behalf, appellant admitted that he bought the meat from Carothers. However, he declared that he did not know that it had been stolen.

It is manifest that Carothers was an accomplice witness. No instruction upon the subject was embraced in the court's charge, notwithstanding appellant excepted as follows: "Defendant further objects and excepts to said charge as a whole for the reason that it nowhere instructs the jury that the witness James Carothers is an accomplice, and fails to instruct the jury on the law of accomplice testimony as applied to the witness James Carothers." The exception was well taken; and we are constrained to hold that reversible error is presented.

We also are of the opinion that the court should have submitted to the jury the question as to whether Joe Blanks was an accomplice witness.

Appellant earnestly insists that there is a variance between the allegation as to the ownership of the meat and the proof

offered in support thereof. We are constrained to agree with this contention. We quote from sec. 2531 of Branch's Ann. P. C. of Texas, as follows: "Ownership should be alleged as in theft, and the indictment should allege the name of the person from whom the property was received, or should allege that such person is unknown." In support of the text several cases are cited, among them being State v. Perkins, 45 Tex. 10; Brothers v. State, 22 Tex. Cr. R. 462; McKay v. State, 49 Tex. Cr. R. 120. Again, we quote from sec. 2448 of the same code: "If possession is alleged in the general owner and the proof shows that another has the actual control, care and management of the property at the time of the theft and that the general owner was not then in possession, the variance is fatal." It is true that the foregoing statement of the rule relates to ownership in theft cases, but it is to be observed that, under the announcement of the decisions, indictments for receiving and concealing stolen property should allege ownership as it is required to be alleged in theft. In Fallon v. State, 230 S. W. 170, in which it is shown that Fallon had been convicted of receiving and concealing stolen property, this court held that the court properly instructed the jury that the ownership and possession might be alleged in the person having actual care, control and management of the property. In Mehlman v. State, 244 S. W. 602, in writing the opinion on motion for rehearing, Judge Hawkins said: "The State having alleged that the property was stolen from Coleman, it was necessary for it to make proof of that fact; but it was not not necessary to prove that appellant, in receiving the property, knew it was stolen from any particular party. If he received it fraudulently, knowing the same to have been acquired by theft, it would be immaterial as to whether he knew the owner."

In Ratcliff v. State, 225 S. W. 53, the conviction was for theft, it being alleged in the indictment that the property was taken from the possession of W. E. Smith. The facts showed that Smith was the owner of a store and that he had a number of employees. However, he managed and controlled the business when he was present. On the occasion of the theft of some of his merchandise he was confined in a hospital, where he remained for six weeks. At this juncture, we quote from the opinion of the court, beginning with the testimony of Smith:

"I went to the hospital on the 6th day of February, and left R. W. Ench in charge of my business. He had absolute care and control of it during the time I was in the hospital. He was at the head of my affairs. I left him in the manage-

ment of my business while I was away. Anything that was in my store was under the control of Mr. Ench. I regarded him as the head of my business while I was away. During the time I was in the hospital I called the men in consultation occasionally, and advised with them; but the actual control and management was in the hands of Mr. Ench. I looked to him to perform my duties as well as he could while I was away. He was the man who had to say whether or not anything should go out of that business. I would hold him responsible. In other words, if anything went wrong he was the man responsible for it. I did not myself exercise any control over the business except what I may have exercised by occasional conversation and consultation. For the first few days after the injury I had no consultations and was not able to see any one. During that time I was absolutely incapacitated. From the 6th of February to the 16th of February I had absolutely no control or management of the business. I did not know what went on there, and could not give or withhold my consent to anything'.

"Ench testified that he had been in the employ of Smith for 12 years as creditman and chief clerk. He said:

" 'Mr. Smith was hurt on the 6th of February. The first time after that that I consulted with Mr. Smith was about six or seven weeks, something like that. I saw him soon, but never told him anything because he was in the hospital, and I didn't want to bother him. I visited him the next day after the injury, but did not converse with him with reference to the conduct of the business. He conversed with me with reference to the business possibly a week after that. We had no talk at that time about my taking charge of the business. We were running it like we always did. Prior to the time he was hurt, Mr. Smith had control, and when he was not there I managed it in his place. From the time Mr. Smith was injured to the twelfth or thirteenth of February his business was absolutely under my control, with the assistance of the other members of the force. I was the head of the business in his absence. That was the condition without any consultation with Mr. Smith after he was hurt.'

"The cigarettes were stolen on the 10th of February while Mr. Smith was in the hospital, and were taken from the store while it was under the control and management of Ench. In an appropriate manner the point was made upon the trial that a variance between the allegation and the proof of ownership was shown. The meaning of our statute on the subject of ownership, and the requisites of pleading and proof thereunder, re-

ceived consideration by the court and its views were expressed by White, Presiding Judge, in the case of Frazier v. State, 18 Tex. App. 442, in the following language:

" 'With regard to the pleading in theft, it is expressly provided that "where one person owns the property, and another person has the possession, charge or (and) control of the same, the ownership thereof may be alleged to be in either." (Code Crim. Proc. art. 426.) It "may be alleged to be in either"— that is, it may and in most instances should be alleged to be in one, and that one should be the one having the actual charge, control and management. It is not in such cases necessary to allege ownership in the actual or general owner; the special owner is the one from whose possession the property is actually taken, and it is only necessary to allege a taking from him, and that it was without his consent. In other words, as the criterion in determining how ownership should be alleged, it should first be ascertained who was in "the exercise of actual control, care and management," at the time the property was taken. If the actual owner, then "the possession" was in him, and should be so alleged, though he may have agents or servants using the property at the time in subordination to his possession. But if the "actual control, care and management" at the time of the taking is in another, then this other is the special owner in "possession," and it is his possession which has been despoiled, and the property should be alleged to be his and taken from his "possession" and "without his consent," without any mention of the actual or general owner— because the property was not "taken" from the latter's "possession." What constitutes the control, care, and management of property must depend upon the circumstances of the particular case, in many instances.

" 'Proof must be made that the property was taken from the possession of the party in whose possession it was alleged to be. If the owner was not in actual possession, but another was, then, if the allegation placed it in the owner and the proof showed it in another who had the "actual control, care and management," then the variance between the proof and the allegation would be fatal, and a conviction could not be had. Let us illustrate the whole matter by actual instances which may occur at any time.'

"Similar views were expressed in the opinion of Hurt, Judge, in Bailey's Case, 18 Tex. App. 432.

"The facts of the instant case bring it clearly within the purview of the decision quoted from. The ownership and possession having been laid in Smith, and the proof developing

that the possession was in Ench, and that the property was under his care, control, and management at the time it was taken, a variance resulted which is fatal to the conviction. Otero v. State, 30 Tex. App. 455, 17 S. W. 1081; Bailey v. State, 20 Tex. App. 76; Hall v. State, 22 Tex. App. 633, 3 S. W. 338; White v. State, 33 Tex. Cr. R. 94, 25 S. W. 290; Williams v. State, 42 Tex. Cr. R. 18, 57 S. W. 93."

Giving effect to the announcement of the decisions, we are constrained to hold that it should have been alleged in the indictment that the stolen meat was the property of Stanley Conner, as it appears from the proof that he had the actual care, control and management of the property at the time of the theft, and that Mr. Heath was not then in possession. Under the circumstances, the variance is fatal.

The judgment is reversed and the cause remanded.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.